TODD BLANCHE
Deputy Attorney General of the United States
SUMMER A. JOHNSON
Attorney for the United States
Acting Under the Authority Conferred by
Title 28, United States Code, Section 515
RICHARD ANTHONY LOPEZ
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: (702) 388-6336
Fax: (702) 388-6418
tony.lopez@usdoj.gov
*Attorneys for the United States*

____ FILED ____ RECEIVED
____ ENTERED ____ SERVED ON
COUNSEL/PARTIES OF RECORD
MAR 11 2026
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: ____ DEPUTY

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

LEONARDO F. BLUNDO,

Defendant.

**CRIMINAL INDICTMENT**

Case No. 2:26-cr- 0034-JAD-EJY

**VIOLATIONS:**
Wire Fraud (18 U.S.C. § 1343)

Money Laundering (18 U.S.C. § 1957)

**FORFEITURE ALLEGATIONS**

**THE GRAND JURY CHARGES THAT:**

**INTRODUCTORY ALLEGATIONS**

At all times relevant to this Indictment:

1. Defendant Leonardo F. Blundo was a resident of Pahrump, Nevada who owned and operated a restaurant named Carmelo's Bistro in Pahrump, Nevada.

2. Carmelo's Bistro was registered with the Nevada Secretary of State's Office under the legal name The Hole in the Wall Group LLC. Nevada Secretary of State records identified Blundo as the sole Manager and Registered Agent for The Hole in the Wall Group LLC.

3. Carmelo's Bistro held a bank account ending in 9750 at Bank of America (the x9750 bank account). Blundo opened the account in 2014 and was the sole authorized signatory on the account.

4. Blundo held an account ending in x7360 with Robinhood Markets ("the x7360 investment account"). Blundo opened the account in 2018 and was the sole owner on the account.

5. Bank of America was a financial institution insured by the Federal Deposit Insurance Corporation headquartered in North Carolina.

6. American Lending Center was a non-bank lender headquartered in California.

<u>The Paycheck Protection Program</u>

7. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

8. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses and sole proprietorships for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP program"). Subsequent legislation provided additional funding for the PPP program and extended its duration. Businesses and eligible individuals could apply for PPP loans through May 31, 2021.

9. To obtain a PPP loan, a qualifying business, independent contractor/self-employed individual, or sole proprietorship was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required

the applicant (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.

10. In the PPP loan application, the loan applicant was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the applicant was eligible to receive under the PPP program. Those applying for a PPP loan were required to provide documentation confirming eligibility.

11. A participating financial institution (the lender) processed a PPP loan application, but the application was also sent to the Small Business Administration ("SBA") through servers outside the District of Nevada.

12. If the lender approved a PPP loan application, it funded the PPP loan using its own monies, which the SBA fully guaranteed. If the lender made a PPP loan to the applicant, the SBA paid the lender a processing fee, which was calculated based on the amount of the loan. The lender transmitted information to the Small Business Administration in the course of processing the loan data from the application, including information about the borrower, and the total amount of the loan. The SBA oversees the PPP program, which has authority over all loans.

13. Over 5,000 lending institutions participated as lenders in the PPP program, including Bank of America and American Lending Center.

14. The business or individual receiving the PPP loan proceeds were required to spend the funds on certain permissible expenses, such as payroll costs, interest on mortgages, rent, and utilities. The PPP program allowed the interest and principal on the PPP loan to be entirely forgiven if the loan proceeds were spent on permissible expense items within a designated period of time and used a specified portion of the PPP loan

proceeds on payroll expenses. When a PPP loan was forgiven, the SBA paid the lender the amount of the forgiven interest and principal.

15. Businesses that could demonstrate at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020 were eligible for a second PPP loan.

The Economic Injury Disaster Loan Program

16. The Economic Injury Disaster Loan ("EIDL") Program is an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

17. Another source of relief provided by the CARES Act was the authorization for the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

18. To obtain an EIDL and advance, a business submitted an application to the SBA and provided information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020. The applicant also certified that the information in the application was true and correct to the best of their knowledge.

19. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the application about employment, revenue, and cost of goods, as described above.

20. EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtained a loan under the PPP, the EIDL funds cannot be used for the same purpose as the PPP funds.

21. EIDL applications were submitted directly to the SBA and processed by the agency via a server outside the District of Nevada. Any funds issued under an EIDL were issued directly by the SBA.

The Restaurant Revitalization Fund Program

22. The Restaurant Revitalization Fund ("RRF") Program was an SBA program that provided grants to businesses "in which the public or patrons assemble for the primary purpose of being served food or drink" that experienced Covid-19-related revenue loss.

23. RRF applicants had to certify that "current economic uncertainty makes this funding request necessary to support the ongoing or anticipated operations."

24. An applicant's grant award was equal to the amount of COVID-19-related revenue loss (up to the program's limits) the applicant experienced, as determined by certain formulas that depended on the date the applicant began operation.

25. For example, entities that began operations on or before January 1, 2019, could receive the difference between their gross receipts as reported on their 2019 and 2020 federal income tax returns, excluding any amounts received from a list of specified sources, such as PPP loans.

26. RRF grant proceeds could be used for specified business expenses, such as payroll costs, mortgage obligations or rent, debt service, utility payments, maintenance expenses, outdoor seating construction, supplies, food and beverage expenses, and operating expenses.

27. RRF applications were submitted directly to the SBA and processed by the agency via a server outside the District of Nevada. Any funds issued under an RRF grant were issued directly by the SBA.

**THE SCHEME TO DEFRAUD**

28. Between on or about March 31, 2020, and on or about September 6, 2021, in the State and Federal District of Nevada and elsewhere,

**LEONARDO F. BLUNDO,**

defendant herein, knowingly participated in and devised and intended to devise a scheme and artifice to defraud and for obtaining money and property from the SBA and PPP lenders by means of materially false and fraudulent pretenses, representations and promises described below.

29. The purpose of the scheme and artifice to defraud was for Blundo to unlawfully enrich himself by causing the submission of materially false PPP, EIDL, and RRF applications.

30. As part of the scheme, Blundo obtained two PPP loans, two EIDLs, and an RRF grant totaling more than $500,000. The funds from these loans and grant were deposited into Carmelo's Bistro's x9750 bank account.

31. To increase the size of the loans and grant for which Carmelo's Bistro was eligible, Blundo falsely and fraudulently inflated its gross revenue, its average monthly payroll, and its number of employees when completing applications for those loans and grant.

32. Blundo further provided false documentation, such as profit and loss statements and tax returns to support some of the false and fraudulent claims in those applications.

33. Blundo further falsely and fraudulently certified that the funds from the loans and grant would be used for purposes permitted by the PPP, EIDL, and RRF programs. Instead, from on or about March 31, 2020, to on or about December 31, 2021, Blundo

transferred from the x9750 bank account more than $200,000 to personal investment accounts, including the x7360 investment account, and more than $25,000 to a cryptocurrency account.

**COUNTS ONE TO FIVE**
Wire Fraud
(18 U.S.C. § 1343)

34. Paragraphs One through Thirty-Three of this Indictment are hereby realleged and incorporated herein by reference.

35. On or about the dates set forth below, within the State and Federal District of Nevada,

**LEONARDO F. BLUNDO,**

defendant herein, for the purpose of executing the above scheme, and attempting to do so, did cause to be transmitted by means of wire communication in interstate commerce the signals and sounds described below, with each wire communication constituting a separate violation of 18 U.S.C. § 1343:

| COUNT | DATE | WIRE COMMUNICATION |
|---|---|---|
| ONE | 3/31/2020 | Submission of EIDL application resulting in $89,400 loan |
| TWO | 4/3/2020 | Submission of PPP application requesting $35,000 loan |
| THREE | 3/30/2021 | Submission of PPP application resulting in a $38,720 loan |
| FOUR | 5/10/2021 | Submission of RRF grant application for $151,870 grant |
| FIVE | 9/6/2021 | Submission of EIDL application resulting in $265,200 loan |

**COUNTS SIX AND SEVEN**
Money Laundering
(18 U.S.C. § 1957)

36. Paragraphs One through Thirty-Five of this Indictment are hereby realleged and incorporated herein by reference.

37. On or about the dates set forth below, in the State and Federal District of Nevada and elsewhere,

**LEONARDO F. BLUNDO,**

defendant herein, did knowingly engage and attempt to engage in the following monetary transactions by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000 that is the deposit, withdrawal, transfer, or exchange of United States currency, such property having been derived from a specified unlawful activity, that is, Wire Fraud, in violation of 18 U.S.C. § 1343, as alleged in Counts One to Five, with each monetary transaction constituting a separate violation of Title 18, United States Code, Section 1957:

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| SIX | 11/1/2021 | $100,000 cash withdrawal from the x9750 bank account |
| SEVEN | 11/9/2021 | $50,000 transfer from the x9750 bank account to the x7360 investment account |

**<u>FORFEITURE ALLEGATION ONE</u>**
Wire Fraud

38. The allegations contained in Counts One and Three through Five of this Criminal Indictment are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture under 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c).

39. Upon conviction of any of the felony offenses charged in Counts One and Three through Five of this Criminal Indictment,

**LEONARDO F. BLUNDO,**

defendant herein, shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense:

an in personam criminal forfeiture money judgment including, but not limited to, at least $545,190 (property).

40. If any property being subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c), as a result of any act or omission of the defendant –

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America, under 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant for the property listed above.

All under 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c); 18 U.S.C. § 1343; and 21 U.S.C. § 853(p).

**FORFEITURE ALLEGATION TWO**
Money Laundering

41. The allegations contained in Counts Six and Seven of this Criminal Indictment are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture under 18 U.S.C. § 981(a)(1)(A) with 28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c); and 18 U.S.C. § 982(a)(1).

42. Upon conviction of any of the felony offenses charged in Counts Six and Seven of this Criminal Indictment,

**LEONARDO F. BLUNDO,**

defendant herein, shall forfeit to the United States of America, any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or any property traceable to such property:

defendant herein, shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1957, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), or a conspiracy to commit such offense:

defendant herein, shall forfeit to the United States of America, any property, real or personal, involved in a violation of 18 U.S.C. § 1957, or any property traceable to such property:

an in personam criminal forfeiture money judgment including, but not limited to, at least $150,000 (property).

43. If any property subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) with 28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c); and 18 U.S.C. § 982(a)(1), as a result of any act or omission of the defendant-

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America, under 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant for the property listed above.

All under 18 U.S.C. § 981(a)(1)(A) with 28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(1); 18 U.S.C. § 1957; and 21 U.S.C. § 853(p).

**DATED** this 11th day of March, 2026.

**A TRUE BILL:**

/S/
FOREPERSON OF THE GRAND JURY

TODD BLANCHE
Deputy Attorney General of the United States

RICHARD ANTHONY LOPEZ
Assistant United States Attorney